**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

**KIMBERLEE TESSEAN,** an individual,

    Plaintiff,

v.

**CSTV NETWORKS, INC.** d/b/a **CBS SPORTS NETWORK**, a Delaware corporation,

    Defendant.

## COMPLAINT AND JURY DEMAND

    Plaintiff Kimberlee Tessean ("**Plaintiff**"), through her undersigned counsel, submits this Complaint and Jury Demand against CSTV Networks, Inc. d/b/a CBS Sports Network ("**CBSSN**" or "**Defendant**").

## PARTIES

1. Plaintiff is an individual who resides at 2396 South Bellaire Street, Denver, Colorado 80022.

2. Plaintiff is a female.

3. CBSSN is a Delaware Corporation with its principal place of business located at 41 West 52nd Street, New York, New York 10019.

4. CBSSN is a digital cable and satellite television network owned by CBS Corporation. CBSSN televises nearly 600 live sporting events every year including live college football and college basketball games.

5. At all relevant times, upon information and belief, Defendant employed at least 15 employees.

## JURISDICTION AND VENUE

6. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("**Title VII**").

7. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367, as the claim arises out of the same case or controversy as Plaintiff's Title VII claims.

9. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) because Defendant regularly conducts business in the District and because Plaintiff lived and worked in the judicial district of the United States District Court for the District of Colorado when the unlawful employment practices and other conduct alleged herein were committed.

## JURISDICTIONAL PREREQUISITE

10. Plaintiff timely filed a Charge of Discrimination against CBSSN with the Equal Employment Opportunity Commission (the "EEOC"). Plaintiff received a Notice of Right to Sue letter, signed February 6, 2018. Plaintiff has fulfilled all conditions precedent to instituting this lawsuit, as necessary, and has otherwise exhausted her administrative remedies.

## GENERAL ALLEGATIONS

### *Employer and Employee Information*

11.  Plaintiff is an experienced operator of television broadcast production equipment called an EVS machine.  EVS is a Belgium-based company that makes equipment and software designed to take live action audio and video footage of, in this case, live sporting events, and create instant replays and slow-motion video, as commonly seen on television during broadcast televised sporting events.

12.  Plaintiff has 16 years of experience operating an EVS machine.

13.  Plaintiff began working for CSTV Network, Inc. in 2004 as a freelance EVS Operator and was kept on as a regular freelancer when CBS bought CSTV Network, Inc.

14.  Plaintiff has performed substantially similar work for a number of other sports television companies and networks.

15.  Plaintiff was a W2 employee of Defendant.

16.  Plaintiff never received a CBSSN employee handbook or copy of CBSSN's human resources policies.

17.  Plaintiff never received any CBSSN workplace training for harassment or discrimination.

18.  Plaintiff regularly worked for Defendant between September and March each year, traveling frequently to work on-location during live sporting events.

19.  In her position with CBSSN as an EVS Operator, Plaintiff traveled from her home in the Denver area to sporting events to set up her work station prior to an event, work the EVS

machine during the event, and then tear down her work station so the equipment could travel on a truck to the next event.

20. Plaintiff's work schedule typically included two or more on-site working days, one or more days to set up her workstation, and "game day," the day on which the sporting event took place and aired on television. Equipment tear-down frequently also happened on game day after the event concluded.

21. Plaintiff's work schedule also included two travel days, one day to travel to the location, one day to travel home.

22. During college football season, Plaintiff regularly worked with a core group of fellow CBSSN employees and a handful of "local" daily workers hired in each city.

23. During college football season, Plaintiff often worked for CBSSN at games in the Mountain West conference, which includes the Air Force Academy and Colorado State University in Colorado, San Diego State University in California, the University of New Mexico, the University of Nevada, Las Vegas, the University of Utah, and the University of Wyoming.

24. The truck Plaintiff most often worked in during college football season would drive from location to location and Plaintiff frequently worked in the very same tractor trailer.

25. On any given game day, there could be between 10 and 15 individuals all working inside the "truck" – the tractor trailer outfitted for the specific purpose of producing the live television broadcast of the sporting event.

26. The truck Plaintiff and her coworkers worked in is approximately 14-feet wide and 53-feet long.

27. Inside the truck are multiple workstations for multiple technical positions worked during each game. These work stations include production, audio, videotape, video, and transmission.

28. On any given set up day, Plaintiff worked between 8 and 12 hours.

29. On most game days, Plaintiff and her coworkers worked between 12 and 15 hours.

30. Plaintiff worked every college football season between 2007 and the 2017-2018 college football season.

### *Plaintiff's "Regular" Work Conditions*

31. As an experienced EVS Operator, Plaintiff was no stranger to working in the male-dominated field of sports television production and frequently was the only woman working in the truck on game days.

32. Because of the nature of Plaintiff's work, Plaintiff's core group of coworkers spent a good deal of time together while traveling away from home, including staying in the same hotels and sharing mealtimes both during and after work. As a consequence, this core group of workers became very familiar with one another.

33. As with close groups of coworkers (in other environments as well), this group of coworkers developed running jokes and "friendly" banter. Disturbingly, however, the general discourse of those in Plaintiff's work group was vulgar and repugnant.

34. Within this particular group of professionals, led by the Director, Matt Plundo ("**Mr. Plundo**") and Producer Scott Brandwein ("**Mr. Brandwein**"), the highest-level on-site

5

employees and *de facto* bosses, the environment was one of constant vulgar language, name-calling, joke-telling, and general abhorrent behavior.

35. Mr. Brandwein was customarily engaged in similar behavior and often encouraged the juvenile behavior of others, all while Mr. Plundo watched and did nothing to stop the behavior.

36. An occasional part of Plaintiff's crew was an African-American male who was frequently the target of racist jokes from male coworkers and comments about the size of his penis. These "jokes" continued even when this individual was not working.

37. Jeff Korotkin ("**Mr. Korotkin**"), Director, Remote Production Management was based New York and rarely traveled with the crew, but generally oversaw scheduling. Mr. Korotkin had knowledge of issues Plaintiff had in the past with a male coworker from another network who, upon information and knowledge, had twice before been terminated from positions with other networks for inappropriate sexual behavior. When that male coworker, Carlos DeMolina, was hired by CBSSN, Mr. Korotkin told Plaintiff he was removing her from working her regular hockey crew in favor of the male, because he knew the two could not work together.

38. Mike Pittman ("**Mr. Pittman**"), Assistant Director, bombarded Plaintiff with his political views during the 2016 election, habitually chanted "build that wall," upon seeing Plaintiff, adding Plaintiff's personal email address to then candidate Donald Trump's mailing list, and telling Plaintiff he donated to Trump's campaign in her name, all because he knew of Plaintiff's opposing political views.

39. Mr. Pittman was frequently the source of much of the reprehensible comments, jokes, and songs, and told Plaintiff that if CBSSN ever checked his work computer he would be in trouble because he regularly downloaded pornography.

40. Mr. Pittman once arrived intoxicated to work a set-up day and proceeded to strip down to his boxer shorts and taunt Plaintiff. Mr. Plundo and Mr. Brandwein knew Mr. Pittman was intoxicated, encouraged his behavior, and allowed him to remain inside the truck despite his condition.

41. One of the running jokes among the male members of the crew was that one particular coworker was a pedophile. This joke was started by Mr. Pittman and encouraged by Mr. Brandwein, who told his children the individual was a "bad man" when they visited the truck one day. Mr. Pittman regularly sang a song about this individual and how he was a pedophile, something Plaintiff has on video.

42. Plaintiff's work environment included the constant celebration of flatulence, sexist and racist jokes, and tales of sexual conquests of her male coworkers while the group traveled away from their families, including one instance in October 2016 when a male coworker demanded Plaintiff leave work to take him to be tested for sexually transmitted infections because he had unprotected sex with a stripper the week before, while on the road working for CBSSN.

43. Plaintiff's work environment was overrun with offensive humor and behavior. This was ongoing banter that took place every day Plaintiff worked with these individuals. This was not a rare occurrence, but was constant, loud, rude, and vulgar.

44. Another of the running jokes of the group were hyperbolic reactions to minor irritations, such as threatening to "murder" someone for making a mistake, or "burning down a building" when something undesirable happened.

45. The frequently-used statement "burn [something] down," was coined following a South Park episode where the town's internet went down and inhabitants of the town go crazy and burn things down. The phrase was often used when the internet was not functioning in the truck or in similar situations where things were not proceeding as planned.

46. Plaintiff's male coworkers frequently called her "bitch," inquired about her sex life, including asking her if she "needed to get laid," and asked her if she "was on her period."

47. Plaintiff's male coworkers called her names like "Carrie," after the horror movie character, knowing it was very offensive to her.

48. This behavior was unwelcome at all times and Plaintiff frequently requested these comments cease.

49. This behavior by Plaintiff's male coworkers was engaged in, encouraged, and tolerated by her superiors, including Mr. Plundo and Mr. Brandwein.

50. This behavior continued throughout Plaintiff's employment with CBSSN.

### *Plaintiff's Complaints of Hostile Work Environment Created by Todd Gordon*

51. As early as 2013, Ms. Tessean began complaining to management about her coworker, Todd Gordon ("**Mr. Gordon**").

52. Mr. Gordon was frequently the source of the most outrageous of the sophomoric behavior.

53. Mr. Gordon routinely drew penises on paper and on the telestrator, a device that allows the operator to draw a freehand sketch over video.

54. Mr. Gordon cut the crotch-area out of a photo of a naked woman and stuck his tongue through the hole while looking directly at Ms. Tessean and created an internal replay effect that only those in the truck could see that featured a drawing of a penis crossing the video screen.

55. Mr. Gordon frequently told racist and other inappropriate jokes.

56. In January 2016, in a series of text messages, Ms. Tessean made complaints about Mr. Gordon's behavior and poor performance to Mr. Brandwein, the Producer of the crew, in hopes of making a change to staffing for the 2016-2017 college football season.

57. Plaintiff requested a transfer of crews from Mr. Korotkin in order to avoid working in the same environment for yet another college football season.

58. Then, on April 9, 2016 and again by text message, Plaintiff outlined for Mr. Brandwein her specific complaints about Mr. Gordon's behavior, including that there were "penis drawings everywhere, constant homosexual jokes/references, [and] endless highly offensive race jokes."

59. Plaintiff and Mr. Gordon worked on the same CBSSN crew the week of April 1 through April 10, 2016, at the Masters golf tournament at the Augusta National Golf Club in Augusta, Georgia. Mr. Brandwein was not the Producer on that crew.

60. With no response from her text messages to Mr. Brandwein, Plaintiff again text-messaged Mr. Brandwein on April 18, 2016 to follow-up on her complaints about Mr. Gordon and the work environment.

61. Mr. Brandwein notified Plaintiff that he had spoken with Mr. Plundo about Plaintiff's concerns and that the two had decided they wanted to keep both Ms. Tessean and Mr. Gordon "on the crew." He said, "Plundo . . . wants Todd," and "Plundo has a big say here. He is the staff director and I value his opinion and what he wants."

62. Mr. Brandwein admitted that Mr. Gordon could be "crude," but "he hasn't killed anyone or done anything outrageous and the whole crew wants him back."

63. Plaintiff told Mr. Brandwein that she wanted to know whether the matter had been addressed before assignments for upcoming season were set so she could request a transfer, if needed.

64. Eventually, CBSSN management intervened and terminated Mr. Gordon's employment. Upon information and belief, Mr. Brandwein, Mr. Plundo, and Mr. Pittman were all put on probation because of their failure to appropriately address Mr. Gordon's behavior and Plaintiff's complaints.

### *Retaliation Against Plaintiff for her Complaints About Harassment*

65. Following Mr. Gordon's termination, Plaintiff returned to working with Mr. Brandwein's crew during the 2016-2017 college football season, covering the Mountain West conference.

66. Plaintiff quickly realized, however, that Mr. Gordon's absence did not solve the issue.

67. The sophomoric behavior not only continued, but the newest banter in the truck was now focused squarely on Plaintiff.

68. Plaintiff's male coworkers began making comments such as, "don't get me fired, Kim," "you're a bitch," "you're grumpy," and "you need to get laid."

69. Plaintiff's male coworkers continued to make sexist and racist comments and added "was that offensive, Kim?" to the tail end of each of their statements.

70. This ongoing vilification was engaged in, encouraged by, and tolerated by Mr. Plundo and Mr. Brandwein, Plaintiff's superiors.

71. Between March 8 and March 12, 2017, Plaintiff worked for CBSSN at the Conference USA Championship for men's basketball in Birmingham, Alabama.

72. Plaintiff endured four days of targeting by superiors and verbal castigation from male coworkers, including Mr. Plundo.

73. Plaintiff's coworker Steven Reeves made several comments to Plaintiff about how she was being targeted by Mr. Plundo and others that week.

74. Plaintiff returned to the hotel from work each day in tears.

75. Upon return home, Plaintiff went to the Emergency Department at Denver Health hospital to be seen for an overwhelming headache and severe physical manifestations of stress. Plaintiff was told her condition was related to stress and she was released to return home.

76. Plaintiff was incapacitated by physical manifestations of stress including migraine headache for the next several days.

*CBSSN Hired a Male to Replace Plaintiff Prior to Any Alleged Wrongdoing by Plaintiff*

77. Andrew Wotring ("**Mr. Wotring**"), a fellow EVS Operator, was introduced to CBSSN by Plaintiff so he could fill-in on east coast events. Plaintiff and Mr. Wotring had previously worked together at other networks.

78. During the relevant timeframe, Mr. Wotring lived in Baltimore, Maryland.

79. Mr. Wotring did some events with CBSSN, but upon information and belief, was never part of a permanent "crew" during college football season prior to the 2017-2018 season.

80. Upon information and belief, Mr. Wotring was contacted by Mr. Korotkin at CBSSN on May 15, 2017, about joining Mr. Brandwein's "crew" as its EVS Operator for the 2017-2018 college football season.[1]

81. Upon information and belief, CBSSN confirmed with Mr. Wotring on June 1, 2017 that he had a place on this crew for the upcoming season.

82. Upon information and belief, on June 21, 2017, CBSSN confirmed that Mr. Wotring would be the EVS Operator on Mr. Brandwein's crew for the 2017-2018 college football season, despite Mr. Brandwein's crew working in the Mountain West conference area, and Mr. Wotring living across the country, on the east coast.

### *CBSSN Terminated Plaintiff for Saying Something Male Employees Repeatedly Said Without Consequences*

83. As of June 6, 2017, Plaintiff had not yet received notification of her college football schedule. Unbeknownst to Plaintiff, her spot as the EVS Operator on Mr. Brandwein's crew had already been offered to Mr. Wotring on June 1, 2017.

84. In an effort to inquire about the status of the crew's schedule, on June 6, 2017, Plaintiff sent a "group" text to her coworkers, including Mr. Brandwein and Mr. Plundo, saying "If [B]reakell tries to take [J]eremy [Ward, Technical Director] away or they try to split up me and [B]rian [Ives, Graphics Operations employee] I am gonna burn down [CBSSN] offices."

---

[1] Each crew is staffed with <u>only one</u> EVS Operator.

85. The phrase "burn down" was used frequently by male employees and superiors including Mr. Plundo and Mr. Brandwein who, upon information and belief, were never disciplined for such conduct.

86. Plaintiff's statement was in no way a credible threat of violence and was made in the spirit of the group's jokes about burning things down as a way to express annoyance with minor issues.

87. Plaintiff was never contacted by CBSSN prior to her termination, nor given a chance to explain the context of the statement.

88. Upon information and belief, two of Plaintiff's coworkers who were involved in the group text conversation, if given the chance, could have explained that the comment was similar to comments frequently made by male employees and was not interpreted by them as a threat of violence.

89. Upon information and belief, Plaintiff's superiors, Mr. Plundo and Mr. Brandwein, retaliated against Plaintiff by sending Plaintiff's text message to CBSSN and misrepresenting the text as a legitimate threat. Mr. Plundo and Mr. Brandwein targeted Plaintiff by reporting her for conduct they had engaged in without consequence.

90. On June 16, 2017, Plaintiff was terminated from CBSSN and told she was being let go for "communicat[ing] a threat of violent, destructive behavior in the workplace through a text message."

91. Upon information and belief, CBSSN never contacted police about Plaintiff's statement nor did CBSSN ask Plaintiff about the alleged threat.

92. Plaintiff was never contacted by police about the statement.

93. In addition to firing Plaintiff, CBSSN also advised local crews not to hire Plaintiff, causing Plaintiff further economic damages.

94. Upon information and belief, Mr. Brandwein's crew worked significantly more games during the 2017-2018 football season that it had ever done before. Upon information and belief, for a significant number of weeks that season, the crew was assigned to work both a Wednesday or Thursday game and a Saturday game, effectively doubling their work days for those weeks.

### *CBSSN Benefitted From Not Paying Plaintiff for All the Hours She Worked*

95. Plaintiff was compensated on an hourly basis.

96. Plaintiff regularly worked hours that would have been considered overtime, had all of the hours she worked been reported.

97. Plaintiff was repeatedly told by Mr. Korotkin that if she reported she had worked overtime while at an event, that she would be paid for the time, but would never be hired again by CBSSN to work any event.

98. Plaintiff's coworkers were told the same, specifically that if they reported overtime hours they would no longer be called to work for CBSSN.

99. It was general knowledge that crew members worked overtime but were not compensated for the time because they were promised retaliation if they reported the actual time they worked.

100. Plaintiff was compensated for operating one EVS machine even when she frequently worked two EVS machines, something other EVS Operators were additionally compensated for at a premium.

**FIRST CLAIM FOR RELIEF**
**Hostile Work Environment Based on Gender**
**in Violation of Title VII, 42 U.S.C. § 2000e,** *et seq*.

101. Plaintiff incorporates each of the allegations above, as if fully set forth herein.

102. Plaintiff was subjected to unwelcome and offensive harassment and discriminatory conduct based on her gender during her employment with CBSSN.

103. Plaintiff's male coworkers created a hostile work environment for Plaintiff because of their pervasive gender-based insults, "jokes," and conduct.

104. Defendant's unlawful harassment against Plaintiff was because of Plaintiff's gender, resulting in adverse impacts to the terms and conditions of Plaintiff's employment and subjecting Plaintiff to a hostile work environment.

105. This harassment was sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's health, well-being, and work performance.

106. Defendant knew or should have known of the unlawful conduct and failed to take prompt, remedial action to stop the pervasive and offensive conduct.

107. Plaintiff suffered severe emotional distress as a result of the hostility, including a hospital visit related to stress.

108. In unlawfully discriminating against and harassing Plaintiff, Defendant acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's rights under the law, thereby necessitating the imposition of exemplary damages.

109. As a result of Defendant's above-described conduct, Plaintiff has suffered extreme manifestations of emotional distress for which she sought medical help, humiliation, and other damages to be proved at trial.

110. As a further direct and proximate result of Defendant's unlawful behavior, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

### SECOND CLAIM FOR RELIEF
### Gender Discrimination in Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.

111. Plaintiff incorporates each of the allegations above, as if fully set forth herein.

112. Plaintiff is a female.

113. At all times, Plaintiff performed her job at, or above, a satisfactory level.

114. On June 16, 2017, Plaintiff was fired.

115. Defendant's reason for firing Plaintiff was pretextual because male employees and superiors engaged in the same conduct and were not fired.

116. Plaintiff's termination from CBSSN was because of her gender and protected conduct.

117. Defendant wanted to replace Plaintiff with a man on Mr. Brandwein's crew, and did replace Plaintiff with a man.

118. Plaintiff's position on Mr. Brandwein's crew was offered to a male employee, even prior to Plaintiff's termination.

119. In unlawfully discriminating against Plaintiff, Defendant acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's rights under the law, thereby necessitating the imposition of exemplary damages.

120. As a result of Defendant's above-described conduct, Plaintiff has suffered loss of income (back pay and front pay), extreme manifestations of emotional distress for which she sought medical help, humiliation, and other damages to be proved at trial.

121. As a further direct and proximate result of Defendant's unlawful behavior, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

### THIRD CLAIM FOR RELIEF
**Retaliation in Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***

122. Plaintiff incorporates each of the allegations above, as if fully set forth herein.

123. On multiple occasions, Plaintiff engaged in protected conduct by voicing her concerns to her direct supervisors about the harassment and hostility she was facing in the workplace based on her gender.

124. Plaintiff was consistently belittled and taunted by male coworkers and her superiors for her protected conduct, specifically for what others saw as her involvement in the termination of Mr. Gordon, namely her complaints about Mr. Gordon's inappropriate workplace conduct to Mr. Brandwein.

125. During the course of Plaintiff's employment with Defendant, Defendant, by and through its agents and employees including Mr. Plundo, Mr. Brandwein, and Mr. Pittman, retaliated against Plaintiff in the terms, conditions, and privileges of her employment, including by taunting and directing hostility toward Plaintiff because of her complaints about gender-based discrimination.

126. Plaintiff was targeted by employees who were disciplined for their failure to appropriately handle Plaintiff's complaints about Mr. Gordon, namely Mr. Plundo, Mr. Brandwein, and Mr. Pittman.

127. Plaintiff was told by Mr. Brandwein that Mr. Plundo wanted to keep Mr. Gordon on the crew, and later learned that Mr. Plundo had been disciplined for his involvement in how Plaintiff's complaints about Mr. Gordon were ignored.

128. Mr. Plundo directed an immense amount of hostility toward Plaintiff over multiple days at an event in March 2017. Upon returning home, Plaintiff sought emergency medical treatment for symptoms of extreme stress.

129. In unlawfully retaliating against Plaintiff, Defendant acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's rights under the law, thereby necessitating the imposition of exemplary damages.

130. Because of Defendant's actions, Plaintiff has suffered loss of income (front pay and back pay), emotional distress, and other compensable damages.

131. As a further direct and proximate result of Defendant's unlawful behavior, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

### FOURTH CLAIM FOR RELIEF
### Quantum Meruit/Unjust Enrichment

132. Plaintiff incorporates each of the allegations above, as if fully set forth herein.

133. Plaintiff regularly worked hours that would have been considered overtime but was encouraged by her CBSSN superiors not to report the overtime or she would be punished and not hired to work future CBSSN events.

134. It was general knowledge that crew members worked overtime but were not compensated for the time because of fear of retaliation for reporting the actual time they worked.

135. Plaintiff regularly worked two machines and should have been compensated for doing so, but was not.

136. At Plaintiff's expense, CBSSN received the benefit of Plaintiff's work without compensating her properly for her efforts as Plaintiff's superiors intimidated her into not accurately reporting the hours she worked.

137. Under the circumstances, it would be inequitable for Defendant to retain the benefit of Plaintiff's work without paying Plaintiff for those benefits.

138. As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment in her favor and against Defendant as follows:

A. Compensatory damages, including without limitation, back pay, front pay, damages for loss of reputation, loss of opportunity for professional growth, additional financial incidental and consequential damages;

B. Non-economic damages for emotional distress, pain and suffering, humiliation, inconvenience, mental anguish, and other non-pecuniary losses;

    C.    Equitable damages including compensation for all hours worked;

    D.    Liquidated, exemplary, and punitive damages as permitted;

    E.    Reasonable attorneys' fees and costs as provided by statute or applicable law;

    F.    Pre- and post-judgment interest; and

    G.    Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated: May 8, 2018

By:   /s/ *Leah P. VanLandschoot*
Leah P. VanLandschoot, #35723
Amy M. Maestas, #46925
THE LITIGATION BOUTIQUE LLC
1720 S. Bellaire Street, Suite 805
Denver, Colorado 80222
T: 303.355.1942
F: 303.355.2199
lvanlandschoot@thelitbot.com
amaestas@thelitbot.com
**ATTORNEYS FOR PLAINTIFF
KIMBERLEE TESSEAN**

**Plaintiff's Address:**
2396 South Bellaire Street
Denver, Colorado 80222